UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JUAN ARTILES-TAVERAS | 17-cr-10212-GAO |

### JUAN ARTILES-TAVERAS' SENTENCING MEMORANDUM

> *Mr. Juan Artiles Taveras is a very respectful person. He is willing to do whatever is asked of him at any time of day…Since the pandemic, Detainee Juan Artiles Taveras has worked long hours and at times 7 days a week Day & Night in facility to ensure that cleaning and sanitation is maintained during this pandemic. He is a great hard worker.*

-Unit Manager Robert Gaul, Wyatt Detention Facility.[1]

Juan Artiles Taveras is not what his worst decisions suggest. He has been a lawful permanent resident since following his mother to the United States 30 years ago. He has always had a job and has been in the same relationship for decades, raising five children.[2] He has never been convicted of a crime. But he committed the crime alleged. He admitted that the day of his arrest; he admitted it before this Court, too.[3] Now he seeks to show the Court that his conduct during the summer of 2017 does not define him.

As a consequence of his crimes, Mr. Artiles Taveras has already served two difficult years in prison, will serve more time in federal prison, and will be deported to

---

[1] See Exhibit 1, Letter from Unit Manager. Typographical errors in original.
[2] His oldest, Anthony, is 22, followed closely by Jonathan (21) and Velmarie (19); his twins Jeremiah and Alia are just 5 years old.
[3] See Exhibit 2; PSR ¶ 24.

a country his has not called home since childhood. He will be at least 50 years-old when released. For him and his family, this outcome is catastrophic and heartbreaking. In consideration of his decades of law-abiding behavior, his acceptance of responsibility, the empirical information about the efficacy of long sentences for non-violent drug offenders, and the § 3553 sentencing factors, Mr. Artiles-Taveras asks this Court to sentence him to a total of 37 months[4] of incarceration and 18 months of supervised release.[5]

## Guideline Range Calculations

While the guidelines themselves are not mandatory, every sentence must begin with correctly calculating the guideline range and holistically considering a number of factors. *Gall v. United States*, 552 U.S. 38, 49, 50 n.6 (2007); *see also Rosales-Mireles v. United States*, 585 US __, 138 S. Ct. 1897, 1903-04, 1908 (2018).

Probation has calculated Mr. Artiles Taveras's Total Offense Level as 30, with a Criminal History Score of zero and a resulting Criminal History Category of I. His guideline range is thus 97 to 121 months. For several reasons, this score and range substantially overstate Mr. Artiles Taveras' conduct and the necessary punishment.

---

[4] According to the United States Sentencing Commission, the median sentence for drug trafficking in the District of Massachusetts for 2021 was 37 months. See https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ma21.pdf. Last accessed June 23, 2022.

[5] This sentence, which must include a separate period of incarceration for the crime of Contempt, can include any appropriate attribution to that count (three). Additionally, the defendant is amenable to supervised release thereafter, notwithstanding U.S.S.G. §§5D1.1(c): "The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment."

First, Mr. Artiles Taveras held a small, tangential role in this offense. The Homeland Security Investigations (HSI) investigation began years earlier and related to an alleged method of drug importation from the Dominican Republic to Boston's Logan Airport.[6] Mr. Artiles Taveras is not alleged to have organized, arranged, or even participated in the creation of this scheme.[7] His single-act drug offense was that of courier on June 2, 2017.[8] This is confirmed by the reality that Mr. Artiles Taveras has not lived in the Dominican since childhood and has never lived in Boston.[9] He did not appear in the years of this investigation's many attempts to complete a transaction.[10] He was not an active member of this conspiracy. Thus, the drug quantity has no nexus to his decisions, role, or underlying criminal intent.

Second, Mr. Artiles Taveras did not negotiate or even know the quantity of cocaine that was agreed upon.[11] Mr. Artiles Taveras never actually saw the drugs, but understood he was to pick up two kilograms of cocaine. After his arrest, he was mirandized, waived *Miranda*, and admitted to his role—that very night—to pick up two kilos of cocaine.[12] The guideline range is based on the six kilograms that agents found in the shipment and Mr. Artiles Taveras agreed that he was legally responsible for that amount. That said, his absence from negotiation and attempts (years long), his belief that the quantity was lower (the Base Offense Level would fall 4 points based on the

---

[6] PSR ¶¶ 9-10.
[7] The PSR (¶¶ 9-21) contains a detailed historical investigation and operation. Mr. Artiles Taveras is never mentioned until he arrived a courier on his date of arrest.
[8] PSR ¶ ¶ 9-21.
[9] PSR ¶¶ 54-57
[10] PSR ¶ 8-21
[11] PSR ¶23.
[12] Exhibit 2; PSR ¶ 24.

difference),[13] and the isolation of this single act, suggest that a score of 30 and a guideline range of at least 8 years drastically overstates his culpability.

Third, Mr. Taveras must accept the consequences of his flight. The Offense Conduct Score adds a total of five points for this conduct, which is substantial.[14] But the context of his flight matters. As detailed in part in attached affidavits, Mr. Artiles Taveras strived for years to own a home for his family. He realized that dream when he bought the house at 1001 Clifton Street, Forked River, New Jersey.[15] Unfortunately, the mere seven days he was held in custody before being released was too much for his employer of nearly a decade and he was fired. His mortgage payments continued, as did the need to support his large family. His pending criminal charges made new employment extremely difficult to obtain. The likelihood of incarceration and deportation were near certain and financial ruin for his family was coming even faster. And that's when Mr. Artiles Taveras made the ill-fated, regrettable decision to flee to Canada so that he could work and send money home to his family to ensure they were supported. After his arrest there on the instant warrant, even that hope evaporated. He sold his family home to his brother. It was gone, another tragic consequence of his decisions. Those consequences are real, and this Court should consider the five-point enhancement in the context of the collateral losses he sought to avoid and eventually suffered.[16]

---

[13] See 2D1.1(c)(7), attributing 26 base score for cocaine amount between 2 and 3.5 kilograms. This would lower his guideline range to 63-78 months.
[14] PSR ¶¶ 38-39.
[15] PSR ¶ 78.
[16] Had he not fled, the drug crime alone would yield a score of 25 and a resulting guideline range of 57-71 months.

## A Sufficient Sentence

To balance the cold math of the guidelines, the Sentencing Commission imbued Section 3553 with a parsimony principle, "instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."[17] Although the statute requires the Court to consider guideline ranges in sentencing, it also "'permits the court to tailor the sentence in light of other statutory concerns as well.'"[18]

## The § 3553(a) Factors

In imposing "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, the Court must consider the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a). The Court must also consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.[19]

---

[17] *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).
[18] *Id.* (quoting *United States v. Booker*, 543 U.S. 220, 245–46 (2005)).
[19] *See* 18 U.S.C. § 3553(a); *Kimbrough*, 552 U.S. at 101.

<u>Mr. Artiles-Taveras's personal characteristics reveal his true nature: a family man
who works tirelessly for the bright future he envisions for his children.</u>

When considering the history and characteristics of the defendant under §
3553(a)(1), courts often cite characteristics like being a hard worker and dedicated
parent to impose a lower sentence than the guidelines would have previously
mandated.[20]

Mr. Artiles Taveras lawfully immigrated to this country 30 years ago to reunite
with his mother. Now, he has quite the full house with his wife and their 5 children, the
oldest college-aged and the youngest in kindergarten.[21] For the near decade ending
with his arrest, he was a machinist at Nitto Automotive in New Jersey, only losing that
job because he was detained pretrial on this case.[22]

A sentence of 37 months will allow the Artiles Taveras family to be reunited
sooner, giving Mr. Artiles Taveras an opportunity to provide for his family and help
raise his children, even after his deportation. A shorter sentence would also accomplish
an important goal that Mr. Artiles Taveras and the government share: with the sooner
return that a shorter sentence will bring, Mr. Artiles Taveras may also be able to
ameliorate some of the vicious effects that a father's absence can wreak:

> *Children of incarcerated parents, whether it is their mother or father who is imprisoned,
> will likely experience emotional, physical, mental and behavioral problems. In one study,
> the sons of incarcerated fathers exhibited aggressive, delinquent and criminal behavior
> shortly after their father's incarceration. In addition to behavioral problems, many of
> these children's school performance declined rapidly upon incarceration of their fathers.
> This reaction to their fathers' incarceration is likely because fathers normally assume*

---

[20] *See United States v. DiMattina*, 885 F. Supp. 2d 572, 581–82 (E.D.N.Y. 2012).
[21] His twins, Aleah and Jeremiah, were conceived via InVitro after years of trying.
[22] PSR ¶ 77.

> *disciplinarian duties. . . . Regardless of the sex of the child, research shows that the children of an incarcerated father are at risk of continuing the cycle of criminality.*[23]

This is more than an abstract consideration. According to January 2022 Intensive Behavioral Health Services Assessment for [his 5-year-old twins], "the school behaviors oppositional breaking things in the school, her father has been in jail, has contact with him via telephone, but she continues to ask him to come home."[24]  Concluding they suffer from Adjustment Disorder based on the absence of a previously very involved father:

> *[5 year old daughter] does not present a profile that indicates any major concern in relationship to any traumatic experience, at the beginning of the school year she was more aware of her father's absence, resulting in her getting more angry and she had difficulty expressing these emotions as a result of her experience she was more aggressive and destructive. She appears to have settle down, however once she realizes that her father will not come back she may experience some difficulty…she is slowly getting used to the idea that she will never see her father again at home…she maintains hope that her father will return once he is free from jail, she does not know that likely he will be deported to his home country. The focus of this particular case is to provide [her] the tools to deal with the lost of her father due to jail. She will be able to visit him in his home country once he is deported."*
> IBHS Assessment, January 2022.[25]

Correspondingly, a below-range sentence leaves open the possibility that his children, while still at an impressionable age, will see their father free and striving to build a better life and to prove that rehabilitation and redemption are possible. A higher sentence, on the other hand, would mean that his twins would be entering middle school or even high school when their father is finally free. The effect of their father's

---

[23] Tiffany J. Jones, Neglected By The System: A Call For Equal Treatment For Incarcerated Fathers And Their Children – Will Father Absenteeism Perpetuate The Cycle Of Criminality?, 39 Cal. W. L. Rev. 87, 99 (Fall 2002).
[24] See Exhibit 2, IBHS reports for each twin, page 1 of 20. Typographical errors in original.
[25] See id. Typographical errors in original.

incarceration during the rest of their childhood, while profoundly visited upon the twins, will unfortunately not be limited to them:

> *Society ultimately bears the burden of familial incarceration because inmates separated from their families have a higher rate of recidivism, their children have a greater likelihood of becoming criminals themselves, and families often become increasingly unstable. Many of these children experience behavioral and educational problems and do not receive the attention they need to discourage them from committing delinquent acts. Society then falls victim to these children's crimes and bears the financial and social costs of supporting them.*[26]

Thus, § 3553(5) urges a lower sentence for Mr. Artiles Taveras because it promotes family unity in line with stated public policy goals.[27] It is also appropriate from a societal standpoint and from the perspective of minimizing the detriment to his children and preventing the cycle of crime and poverty from plaguing his family.

Mr. Artiles Taveras is now 47 years old, looking towards rebuilding his life as provider and family leader. As a middle-aged offender who will spend time in federal prison, his likelihood of reconviction is just 15.9%.[28] On balance, his personal history and characteristics justify granting a low sentence.

<u>Mr. Artiles Taveras's absence of a criminal history and personal characteristics demonstrate that he poses virtually no threat to the community with little need for deterrence.</u>

---

[26] Tiffany J. Jones, *Neglected By The System: A Call For Equal Treatment For Incarcerated Fathers And Their Children – Will Father Absenteeism Perpetuate The Cycle Of Criminality?*, 39 Cal. W. L. Rev. 87, 99 (Fall 2002) (internal citations and quotations omitted).

[27] See U.S.S.G. § 5H1.6, note B.

[28] Across all ages, federal prisoners had a much lower recidivism rate than state prisoners who also were released in the same year and tracked by the Bureau of Justice Statistics. (Page 3). Fewer than one in eight federal prisoners who are released between the ages of 50 and 54 will be reconvicted. If Mr. Artiles-Taveras is sentenced to 37 months, she will be in that age group when released. (Figure 14) *See* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed September 17, 2021).

Nearly half a century of law-abiding behavior and a determination to provide for his family both counsel in favor of a lower sentence for Mr. Artiles Taveras.[29]  Courts have also used statistics regarding recidivism rates for first time offenders like Mr. Artiles Taveras to justify under § 3553(a)(2)(B) the satisfactory deterrent effect of a shorter sentence.[30] A defendant's stated commitment to rehabilitation is an appropriate consideration under § 3553(a)(2)(C), and a studied belief in that statement can justify a lower sentence based on a defendant's projected lack of danger to the community.[31] As detailed below, even with limited access to programs, Mr. Taveras has completed nearly a dozen programs or self-improvement exercises while at Wyatt.[32] All of this, while working "long hours and at times 7 days a week Day & Night in facility to ensure that cleaning and sanitation is maintained during this pandemic."[33]

A sentence of 37 months is appropriately parsimonious in line with § 3553(a). Both Mr. Artiles Taveras's age at release and status as a first-time offender with no criminal history render him unlikely on a statistical level to recidivate. This is especially true when these low risk factors are combined with his emphasis on regaining lawful employment to support his family. Mr. Artiles Taveras does not need the negative incentive of multiple years in prison to appreciate the wrongfulness and import of his conduct or to motivate reform.

---

[29] *See United States v. Ramirez*, 221 F. App'x 883, 887–88 (11th Cir. 2007) (the sentencing court considered "devotion to his family, work history, and lack of a criminal history" in giving a bottom-of-the-range sentence).
[30] *See United States v. Watt*, 707 F. Supp. 2d 149, 158 (D. Mass. 2010).
[31] *See United States v. Martin*, 520 F.3d 87, 93–94 (1st Cir. 2008) ("A founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence under the now-advisory guidelines.")
[32] Exhibit 9, including nearly a dozen certificates of completion or records ofw achievement while detained.
[33] Exhibit 1.

Mr. Artiles Taveras is a hard-working family man who acknowledges his mistakes and has already begun the rehabilitative process.[34] He is committed to supporting his family and abiding by the law to be a productive member of society upon his release. Mr. Artiles Taveras has a strong support system, as evidenced by the letters written by his family and friends, including his wife, mother, sister-in-law, and step-children. His good conduct and hard work during his detention are spoken about in the letters from the both the warden and unit manager at Wyatt Detention Facility.

Mr. Artiles Taveras's family, like him, acknowledge and understand that he made a mistake. His wife, Maria, describes her husband as a good father and an excellent husband, whom she and her children desperately love, miss, and need greatly.[35] His sister-in-law speaks of how dedicated Mr. Artiles Taveras is to his entire family, that he is a man who serves God who deserves a "second opportunity" because he is a "good man" who takes care of his children and nephews, who view him as their father.[36] His friend, Francisca Mendez, tells of his "kind heart"and how he is "an admirable and devoted father who gives everything for his children" and loves his family and friends.[37] His step-son, Jonathan, wrote to explain that Mr. Artiles Taveras is an "amazing step-dad" and the only father figure in his life, who would take him to school every morning, watch *novelas* and play baseball with him, and who has "loved me more than I can ever imagine."[38] Jonathan describes the pain he has felt since Mr.

---

[34] Exhibit 9.
[35] See Exhibit 4, letter from Maria Santana, wife of Juan Artiles Taveras (May 26, 2022).
[36] See Exhibit 5, letter from Santa Isabel Santana, sister-in-law of Juan Artiles Taveras (May 2, 2022).
[37] See Exhibit 6, letter from Francisca Mendez, friend of Juan Artiles Taveras (Mar. 14, 2022).
[38] See Exhibit 7, letter from Jonathan Catala, step-son of Juan Artiles Taveras (May 23, 2022).

Artiles Taveras has been detained and how he misses "the most important person in my life," whom he admires for all of the sacrifices he makes for his family.[39] Mr. Artiles Taveras's step-daughter, Velmarie, writes that he "stepped up to be the father that I needed," and is "the perfect father figure," taking time to bond with her, cooking with her, and taking her to church.[40] She explains how she admires him and that he has always sacrificed and fought for his family.[41] Mr. Artiles Taveras's only desire is to reunite with his family so that he can continue to be the loving and supportive husband and father they deserve.

Mr. Artiles Taveras's hard work and dedication have also been clear during his time at Wyatt Detention Facility. During his pre-sentence detention, Mr. Artiles-Taveras has done more rehabilitative and actual work than most would do throughout the course of a five-year sentence. Robert Gaul, the unit manager at Wyatt Detention Facility wrote a letter in support of Mr. Artiles Taveras, specifically commending his superb work ethic and his dedication to improving himself while he is detained: "He has participated in various Educational Classes, Mental Health Courses & Vocational Training.[42] He had achieved various certificates from the facility . . . [he] attends church services in the facility to improve himself."[43] Mr. Gaul notes that Mr. Artiles Taveras is "a very respectful person" who is "willing to do whatever he is ask [sic] of him at any time of day."[44]

---

[39] *Id.*
[40] See Exhibit 8, letter from Velmarie Santana, step-daughter of Juan Artiles-Taveras (May 26, 2022).
[41] *Id.*
[42] See Exhibit 1, letter from Robert Gaul, Unit Mgr. at Wyatt Detention Facility (Feb. 18, 2021).
[43] See *id.*
[44] See *id.*

Moreover, Mr. Artiles Taveras has an incredible work ethic, not only volunteering as a Unit Pod Worker doing cleaning and painting of the unit, but volunteering for additional duties as well. He has been a Captain Crew worker since May 2021. Mr. Gaul describes Mr. Artiles Taveras as an "exceptional worker" with "strong dedication," who has "worked long hours and at times 7 days a week Day & Night in facility to ensure that cleaning and sanitation is maintained during this pandemic."[45] Mr. Artiles Taveras is a "great hard worker" who, even in difficult pandemic conditions, was willing to clean and sanitize the unit, and worked lengthy hours "without any complain [sic] & hesitation," "especially when others did not want to assist."[46]

It is worth noting that Mr. Artiles Taveras has achieved these accolades during a period of incarceration unlike any period in recent history. The COVID-19 pandemic wreaked havoc on the world, and men in prison felt particularly harsh consequences.[47] His work was selfless and telling. And despite lacking even a single disciplinary report, he has spent more time in difficult solitary conditions than most would during a multi-year sentence, all to preserve his medical safety.

In additional to all these factors which suggest rehabilitation and deterrence have been satisfied and are certainly accomplished by the proposed 37-month sentence, there is also evidence demonstrating that prison may actually heighten the risk of

---

[45] See *id.*

[46] See *id.*

[47] https://www.unodc.org/documents/commissions/Congress/special_events/Special_Event_-_COVID-19_and_prisons_concept_note.pdf. Last accessed June 23, 2022.

recidivism.[48] "The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society. The persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality."[49]

<u>A 37-month sentence for Mr. Artiles-Taveras is warranted by his personal characteristics and is consistent with other sentences in the District.</u>

The Court must also consider the need to avoid unwarranted disparities among similar offenders. 18 U.S.C. § 3553(a)(6). However, this preference is not to avoid all disparities at all costs. Rather, it is to avoid unwarranted disparities; disparity remains an ameliorative tool to adjust the guidelines because "[f]air sentencing is individualized sentencing."[50]

Statistics show over and over that giving more time for drug crimes exacerbates rather than mitigates the problem of drug trafficking. Research on legislation around the crack cocaine epidemic, both on the Anti-Drug Abuse Act of 1986 and the Fair Sentencing Act of 2010, demonstrates that heavy-handed sentencing schemes do not reduce harm based on use or sales and have an inverse relationship to the goals of sentencing.[51]

---

[48] *See e.g.*, The Sentencing Project, *Incarceration and Crime: A Complex Relationship*, 7 (2005)
[49] *Id.* at 7. (footnote and citation omitted).
[50] U.S. Sentencing Commission, *Fifteen Years of Sentencing*, (Nov., 2004) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (last accessed June 23, 2022).
[51] *See,* e.g.,Lauryn Saxe Walker & Briana Mezuk, *Panel Paper: Mandatory Minimum Sentences: The Impact on Crack and Powder Cocaine Use*, APPAM DC Regional Student Conference (2017), https://appam.confex.com/appam/sc17dc/webprogram/Paper19844.html (assessing the impact of the Anti-Drug Abuse Act of 1986 and the Fair Sentencing Act of 2010 on crack-cocaine use, and finding no differential impact). *See also* USSC, *Report to the Congress: Impact of the Fair Sentencing Act of 2010*, 11-12, 27

A sentence of 37 months follows the District and Circuit norms: departing downward and varying downward even more often than the national average, and rarely exceeding the minimum range set by the guidelines. In the District of Massachusetts, the majority of cases are below the guidelines.[52] On a national level, the majority of sentences are within the guideline range.[53]

Offense-specific trends also reflect the notion that less time is more appropriate. Data from the United States Sentencing Commission shows that many sentencing courts, but especially in the District of Massachusetts, find the guidelines unreasonable for nonviolent drug trafficking crimes. The national and First Circuit data especially reflects the operation of a mandatory minimum rather than the appropriateness of harsh sentencing regimes for drugs. Nationally, the average sentence for a drug trafficking crime is 74 months, and the mean is 60 months.[54]  In the First Circuit, the average sentence and the median sentence are 61 and 60 months respectively.[55] For the District of Massachusetts, the mean is 50 months and the median is 37 months.[56] Thus, Mr. Artiles Taveras's proposed sentence of 37 months is tailored to the typical sentence

---

(2015) (finding that half as many individuals were sentenced in 2014 in the federal system as had been in 2010; that crack-cocaine represented the most commonly-sentenced drug in only 9 federal districts in 2014, down from 36 districts in 2010; and that passage of the Act did not disrupt the ongoing decline of crack-cocaine users according to survey data).

[52] *See* United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2021: District of Massachusetts*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ma21.pdf (last accessed June 23, 2022).

[53] *Id.*

[54] *See* United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2021: First Circuit*, 11 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/1c21.pdf (last accessed June 23, 2022).

[55] *Id.*

[56] *See* United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2020: First Circuit,* 11 https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/1c21.pdf (last accessed Sep. 21, 2021)

for this type of crime locally.  Any "disparity" amongst similarly situated defendants can be justified by his personal characteristics, such as his status as the primary breadwinner for a large family and his recommitment to honest work. Mr. Artiles Taveras has fully accepted responsibility for his actions, which are truly an anomaly on his spotless record. Therefore, a sentence of 37 months will not create an unwarranted disparity, in compliance with § 3553(a)(6).

Mr. Perez-Garcia, co-defendant who played a more substantial role in planning and executing the transaction, according to the PSR, received a sentence of 57 months.[57] In fact, according to the PSR, Mr. Perez-Garcia spent more than a year communication with the CW to create the transaction.[58]

Finally, as the First Circuit made clear in *United States v. Hercules*,[59] this Court can consider the eventual deportation of Mr. Artiles Taveras as part of its analysis under § 3553. Mr. Artiles Taveras will be sent to a place he has not called home since childhood, nearly 30 years ago. He will be away from his family, and its robust support system. He will inevitably attempt to regain his role as provider, but this time from a place he has never worked and in an economy that has a cost of living that is a fraction of that in New Jersey, where his young (citizen) children will reside.[60]

## Conclusion

---

[57] PSR ¶¶ 11-23.

[58] PSR ¶P 13-24, noting Perez-Garcia's yearlong efforts to arrange a deal.

[59] *United States v. Hercules*, 947 F.3d 3 (2020).

[60] https://livingcost.org/cost/dominican-republic/united-states last accessed June 23, 2022. Cost of living in DR is 62% less than in the United States. The average after-tax salary in the United States covers living expenses in the US for 2 months, while the average salary in the Dominican Republic covers just .4 months of living.

Mr. Artiles Taveras is a humble, hard-working, family man who wants the chance to rebuild his life in a safe place. While he committed a crime and exacerbated his crime with his flight, it was a drop of a lapse of judgment in a sea of law-abiding, peaceful behavior. To this day, he remains dedicated to his family and providing for them, hopeful that this Court will give him the chance to show he is the person all observers say he is. This moment in his life is a crucial crossroads in Mr. Artiles Taveras's redemption story, and the Court can grant him the opportunity to live that story by sentencing him to 37 months.

Respectfully Submitted,
Juan Artiles-Taveras
By and through counsel

Date: June 23, 2022

*/s/ Leonard E. Milligan III*
Leonard E. Milligan III
BBO #668836
MILLIGAN RONA DURAN & KING LLC
50 CONGRESS STREET, SUITE 600
BOSTON, MA 02109
t. 617.395.9493
lem@mrdklaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I, Leonard E. Milligan III, himeby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on this date.


Date: June 23, 2022                    <u>/s/Leonard E. Milligan III   </u>
                                                          Leonard E. Milligan III